# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**TERRY JONES,**

    Plaintiff,

  v.                                 Case No. 18-CV-823

**ANDREW M. SAUL**[1]**,**
**Commissioner of Social Security,**

    Defendant.

## DECISION AND ORDER

Terry Jones seeks judicial review of the final decision of the Appeals Council of the Social Security Administration denying his claim for disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). On August 2, 2017, an administrative law judge (ALJ) denied Jones' claim at step five, concluding that Jones retains sufficient residual functional capacity such that he can perform "jobs that exist in significant numbers in the national economy." R. 26. Jones subsequently sought judicial review. For the reasons set forth below, the case will be remanded for further proceedings consistent with this decision.

## BACKGROUND

Jones' disability claim stems from two vehicular accidents. As a result of these accidents, Jones sustained a laundry list of injuries, including the amputation of his right index

---

[1] Pursuant to Fed. R. Civ. P. 25(d), because Andrew M. Saul is the current Commissioner of the Social Security Administration, he is the proper named defendant and is substituted into the case.

fingertip, and suffers from numerous symptoms, including lower-back pain, severe headaches, post-traumatic stress disorder, depression, and anxiety. R. 17-19.

After filing for disability on July 9, 2014, the Commissioner initially denied his claim on November 29, 2014 and affirmed the denial on reconsideration. After subsequently appearing before and testifying at an administrative hearing, the ALJ denied Jones' claim on April 14, 2017. The Appeals Council affirmed, and Jones filed this appeal.

A disability claim must satisfy five sequential steps. In his decision, the ALJ determined that Jones had not engaged in substantial gainful activity since the onset of the disability, thus satisfying step one. The ALJ determined that Jones suffers from a "right index finger fracture, status post fingertip amputation, mildly comminuted and displaced lateral scapular body fracture/left shoulder, headaches, PTSD, depression and anxiety," thus concluding that Jones suffers from severe impairments and satisfying step two. The ALJ determined that Jones does not have a severe impairment that meets or medically equals the severity of the listed impairments that would satisfy step three. At step four, the ALJ determined that Jones' severe impairments preclude Jones from performing any past relevant work.

The ALJ denied his claim at step five, concluding that Jones maintains sufficient residual functional capacity (RFC) such that he could perform jobs that exist in significant numbers in the national economy. The ALJ concluded that Jones' RFC permits him to engage in some types of "unskilled work involving simple, routine, repetitive tasks; no work with the public; and no fast-rate production work." In determining that Jones' RFC does not permit disability, the ALJ relied upon the testimony and opinion of the vocational expert (VE). The VE testified that someone with Jones' RFC would be able to perform jobs such as garment

sorter and merchandise marker, which are categories of jobs that contain approximately 100,000 positions and 500,000 positions in the national economy, respectively. R. 26.

In assessing whether Jones' RFC permits him to perform jobs that exist in significant numbers in the national economy, the ALJ largely discounted the opinions of Dr. Ibsa, Daina Westerman, Jones' therapist and a licensed master social worker, and Basil Maduka, doctor of nursing practice (nurse practitioner), each of whom opined in part that Jones would remain off-task for a significant percentage of the workday, would require day-long absences from work for more than three days per month, and would likely be unable to sit or stand for prolonged periods of time. Specifically, Dr. Ibsa, his physician, opined that that Jones would be "off-task" more than thirty percent of the of the work day and would work at less than fifty percent the pace of an average employee, that Jones would be unable to sit for ten minutes at a time, stand or walk for ten minutes at a time, and that Jones would likely be absent more than four days per month. R. 1102-06.

Daina Westerman, the social worker, opined that Jones would suffer impairment-related absenteeism three days per month, that he would likely need to lie down three or more hours during an eight-hour daytime period, that he would likely remain "off task" for more than thirty percent of the work day, and that he would work at less than fifty percent of the pace of an average employee. R. 635-58; 1125-29; 1131-35. Likewise, Basil Maduka, the nurse practitioner, opined that Jones would be "off task" for more than twenty percent of the workday and would work at sixty percent of the pace of an average employee. He further believed that Jones would require about three unscheduled breaks per day and would suffer impairment-related absenteeism about three days per month. R. 639-43.

3

Even though the ALJ ultimately afforded "little weight" to these opinions, the ALJ questioned the VE whether jobs exist in significant numbers in the national economy for an individual suffering from the limitations described by Dr. Ibsa, Westerman, and Maduka. The VE testified that no jobs would exist for someone limited to light, unskilled work and who also could sit for only fifteen minutes, would remain off-task for more than ten percent of the workday, or would incur more than one unexcused absence in a month. R. 50-53.

## ANALYSIS

**I.     Applicable Legal Standards**

The Commissioner's final decision will be upheld "if the ALJ applied the correct legal standards and supported [her] decision with substantial evidence." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 42 U.S.C. § 405(g); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811 (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). The ALJ "must build an accurate and logical bridge from the evidence to [her] conclusion[s]." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (citing *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998)).

The ALJ is also expected to follow the Social Security Administration's ("SSA") rulings and regulations. Failure to do so, unless the error is harmless, requires reversal. *See*

4

*Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court "does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943)); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## II. Treating Providers

### A. The ALJ failed to provide "good reasons" for failing to confer controlling weight upon Dr. Ibsa's opinion.

Dr. Ibsa opined that Jones would remain "off-task" more than thirty percent of the workday, would work at less than fifty percent of the pace of an average employee, would be unable to sit or stand for ten minutes at a time, and would likely be absent more than four days per month. R. 1102-06. The ALJ is required to give "controlling weight" to treating medical providers if their opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(d)(2). In sum, a treating source's opinion is entitled to controlling weight if it is "'well-supported and not inconsistent with other substantial evidence.'" *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (quoting *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016)).

However, if an ALJ refuses to give controlling weight to the opinions of the treating medical providers, the ALJ is required to provide "good reasons." 20 C.F.R. § 404.1527(d)(2). Accordingly, the ALJ cannot "'simply discard [the opinions].'" *Meuser*, 838 F.3d at 912 (quoting *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014)). "Rather, the ALJ [is] required

5

to explicitly consider the details of the treatment relationship and explain the weight he [is] giving the opinion." *Id.* Indeed, the reasons the ALJ provides must "build an accurate and logical bridge form the evidence to [his] conclusion[s]." *Clifford*, 227 F.3d at 872.

Further, even if the ALJ declines to extend controlling weight, the ALJ still must "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" in determining the appropriate degree of weight to afford to the opinions. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ must weigh the opinion against all other factors set forth in 20 C.F.R. §§ 404.1527 and 416.927, factors that include the examining relationship, length of treatment relationship, frequency of examination, as well as other factors.

Here, the ALJ refused to accept Dr. Ibsa's opinions because Dr. Ibsa's responses were vague and limited to checked boxes, because Dr. Ibsa wrote that he does not remember the frequency with which Jones visited the physician's offices, and because Jones' neurological examinations were unremarkable.

### 1. First reason: check-boxed form

First, the ALJ refused to give controlling weight to Dr. Ibsa's opinion in part because Dr. Ibsa's "responses are vague and limited to checked boxes with no further explanations as to how his conclusions were reached." R. 21. Initially, whether an ALJ must give controlling weight to a treating source's opinion does not hinge upon whether it is given in narrative or check-box form. Rather, the question is whether the opinion is "well-supported and not inconsistent with other substantial evidence." *Meuser*, 838 F.3d at 912 (internal citations

omitted). Indeed, a check-box form "takes on greater significance when it is supported by medical records," as it is here. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

The ALJ also found that there were no "further explanations as to how" Dr. Ibsa's conclusions were reached. R. 21. However, the five-page form itself supplies ample explanations. For example, it indicates that Jones' medications would cause drowsiness and sedation. R. 1102. It states that Jones experiences migraines and that his headaches occur three times per week. R. 1105-06. The form further indicates that Jones needs to lie down in a darkened, quiet room when he experiences a headache. R. 1106. From these statements, one can very reasonably infer the reasoning behind the physician's conclusion that Jones would miss "more than 4 days" of work per month, R. 1105, or be "less than 50%" as efficient as an average worker, R. 1102.

Moreover, Dr. Ibsa's own conclusion is "not inconsistent" with other medical evidence in the record. 20 C.F.R. § 404.1527(d)(2). Westerman, the social worker, provided an assessment that contained comparable findings. R. 635-58. She wrote that Jones' medications caused fatigue and concluded that he would need to lie down three or more hours during an eight-hour day. R. 635. She further concluded that Jones would miss more than four days of work per month and that he would be off-task more than thirty percent of a workday. R. 636-37. In addition, Basil Maduka, the doctor of nursing practice, estimated that Jones would be "off-task" for more than twenty percent of the workday and would require about three unscheduled breaks per day, and that Jones would suffer impairment-related absenteeism about three days per month. R. 639- 43. More importantly, in dismissing Dr. Ibsa's opinions, the ALJ fails to point to *any* inconsistent or contradictory evidence. *See Clifford*, 227 F.3d at 870 (ruling that the ALJ erred when it refused to extend controlling weight

7

to a treating source's opinion in light of the complete absence of any contradictory medical opinion). While the ALJ cited to evidence he contended contradicted Dr. Ibsa' opinions, the evidence to which he cited merely failed to explicitly bolster Dr. Ibsa's opinions.

For instance, the ALJ cites to the fact that the claimant maintained "normal gait and could walk on heels and toes without difficulty;" however, for this evidence to contradict Dr. Ibsa's opinions, the ALJ would necessarily have to infer that the ability to maintain normal gait medically prevents that patient from remaining "off-task" in full-time employment. Because the observation of normal gait does not intuitively relate to the patient's capacity to remain "on-task," in making this conclusion, the ALJ impermissibly "played doctor." *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (affirming that "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings").

Further, the Commissioner emphasizes that checkmark opinions may suggest that the medical opinion was based on subjective complaints. However, "any medical diagnosis necessarily must rely upon a patient's history and subjective complaints," and thus the mere fact that Dr. Ibsa's opinion may have relied upon Jones' subjective complaints does not, by itself, provide reason to doubt their credibility. *Flores v. Massanari*, 19 F. App'x 393, 403 (7th Cir. 2001) (citing *Flanery v. Chater*, 112 F.3d 346, 350 (7th Cir. 1997)). Accordingly, the fact that Dr. Ibsa's responses were unexplained or limited to check-marked boxes do not constitute "good reasons" for the ALJ to discount the medical opinion.

### 2. Second reason: frequency of treatment

Second, the ALJ refused to give Dr. Ibsa's opinion controlling weight in part because the ALJ questioned whether Dr. Ibsa treated Jones "on a consistent basis." R. 21. This conclusion resulted from the fact that, on the form, Dr. Ibsa indicated he "does not

8

Case 2:18-cv-00823-SCD   Filed 07/14/20   Page 8 of 17   Document 28

remember" the frequency of his treatment with Jones. R. 1102. However, the fact that a physician might not remember the frequency of treatment could mean merely that he does not remember whether treatment was semi-annual, annual, or monthly. Little more can safely be inferred. In addition, the evidentiary record supplies information about treatment frequency. Indeed, Jones visited Dr. Ibsa on multiple occasions each year between at least 2014 through 2016. *See generally* R. 507-09; 770-83. Accordingly, the ALJ's second reason for discounting Dr. Ibsa's opinion does not constitute a "good reason."

### 3. Third reason: unremarkable neurological examinations

Third, the ALJ refused to extend controlling weight in part because he determined that Jones' neurological examinations were "unremarkable . . . [because] he displayed normal gait and could walk on heels and toes without difficulty, and he denied any symptoms on multiple occasions." R. 21. The ALJ cited a number of records supporting his conclusion, but none of them appear to do so. For instance, the ALJ cited progress notes Dr. Somchai Laowattana, a neurologist, wrote in December 2014. R. 664. However, the only evidence contained on this document that could conceivably support the ALJ's conclusion is a casual reference that Jones reported "that his headaches ha[ve] been less intense." R. 654. However, in the same treatment note, Dr. Laowattana indicates that the plaintiff had begun experiencing "blacking out" episodes "a few times a week." R. 664. Similarly, the ALJ also cited Dr. Laowattana's January 2015 exam, but again the neurologist noted Jones was still blacking out. R. 675. Finally, as another example of "den[ying] any symptoms," the ALJ cited December 2015 notes documenting a telephone call with a nurse regarding unspecified test results. Apparently the ALJ viewed this as an example of Jones denying symptoms based on the note's bare statement that "Patient does not have any concerns at time of call." R. 697. This statement

9

cannot support the ALJ's conclusion, however. In fact, it appears from the record that the test results about which Jones was inquiring related to an urgent care visit regarding urethritis. R. 693. When he received "normal results" of his urine test, he (not surprisingly) expressed no further "concerns." R. 697. Taken in its actual context, it should be clear that the bare statement that he had no concerns does not mean he "denied" any of the symptoms that are relevant to his claim for disability. Similarly, none of the other documents to which the ALJ cite support the ALJ's assertion that Jones has denied his symptoms. Accordingly, the ALJ's third reason for discounting Dr. Ibsa's opinion does not constitute a good reason.

### 4. Impermissible post hoc rationalization

Finally, the Commissioner attempts to support the ALJ's conclusion with citation to Dr. McWatter's opinions and "Plaintiff's admitted activities." ECF No. 20 at 7-8. However, as Jones points out, the ALJ did not in fact base his decision to afford "little weight" to the opinions of Dr. Ibsa on either of these bases. Accordingly, the Commissioner cannot now, as an impermissible *post hoc* rationalization, support the ALJ's decision on these two bases. *See Acevedo v. Barnhart*, 474 F. Supp. 2d 1001, 1005 (E.D. Wis. 2007) (affirming that Administration's lawyers cannot fill in the gaps to support an otherwise unsupportable administrative decision); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ"). Therefore, I conclude that the ALJ failed to provide "good reasons" in according little weight to Dr. Ibsa's opinions.

**B.  The ALJ improperly assigns "little weight" to Westerman and Maduka.**

Daina Westerman, Jones' treating therapist, and Basil Maduka, the nurse practitioner, both offered substantially similar assessments: that Jones would remain "off-task" for at least twenty percent of the workday, that Jones could work at a rate at most sixty percent of that of the average worker, that Jones would incur at least three impairment-related absences per month. *See* R. 557-61 (documenting Westerman's opinions of Jones' impairments); 635-58 (same); 1125-29 (same); 1131-35 (same); R. 639-43 (documenting Maduka's opinions). However, the ALJ afforded their opinions "little weight," a decision Jones now argues constitutes error.

As an initial matter, the Commissioner argues that neither Westerman nor Maduka qualify as acceptable medical sources such that their opinions may be entitled to controlling weight. The Commissioner is correct. A treating source's opinion is entitled to controlling or deferential weight only if it qualifies as a medical opinion. 20 C.F.R. § 404.1527(a)(1). A medical opinion is defined as "statement from *acceptable medical sources* . . . ." *Id*. In turn, an acceptable medical source means a medical source like a "[l]icensed physician; [l]icensed psychologist" or similar medical source. *See* C.F.R. § 416.902(a).[2]

Here, Westerman holds a Licensed Master of Social Work (LMSW) degree and Maduka holds a Doctorate of Nursing Practice. R. 21, 22. However, neither degree qualifies Maduka or Westerman as an acceptable medical source. *See Tapley v. Comm'r of Soc. Sec.*, Case No. 1:15-cv-1181, 2017 WL 1074651, at *7 (W.D. Mich. Mar. 22, 2017) (affirming that an

---

[2] The definitions were broadened to include "Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . [and] [l]icensed Physician Assistant for impairments within his or her licensed scope of practice." 20 C.F.R. § 416.902. However, these categories apply only to claims filed on or after March 27, 2017. R. 13. Accordingly, those broader categories do not apply here.

individual holding a LMSW does not qualify as an acceptable medical source); *see also Turner v. Astrue*, 390 F. App'x 581, 586 (7th Cir. 2010).

Although the ALJ need not afford Maduka and Westerman's opinions "controlling weight," the ALJ must consider their opinions and properly determine the requisite weight to give them. Their opinions qualify as "opinions from medical sources who are not acceptable medical sources." 20 C.F.R. § 404.1527(f)(1). "[O]pinions from these 'other sources' are important and should be evaluated on key issues such as impairment severity and functional effects." *Hunt v. Astrue*, 889 F. Supp. 2d 1129, 1143 (E.D. Wis. 2012); *see also Lauer v. Apfel*, 169 F.3d 489, 494 (7th Cir. 1999) (affirming that "reports from non-physicians are helpful when determining functional capacity"). Indeed, opinions from other sources may demonstrate "the severity of the individual's impairment(s) and how it affects the individual's ability to function" and, in fact, "may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Joseph H. v. Saul*, No. 17 C 50353, 2019 WL 5963631, at *10 (N.D. Ill. Nov. 12, 2019).

In determining the degree of weight to afford to these opinions, an ALJ should consider the six factors listed in paragraph (c)(1) through (c)(6). 20 C.F.R. § 404.1527(f)(1); *see Dogan v. Astrue*, 751 F. Supp. 2d 1029, 1039 (N.D. Ind. 2010) (affirming that these factors "represent basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources'"). These factors include the examining relationship, treatment relationship, length of the treatment relationship and the frequency of examination, supportability, consistency, specialization, and other factors. *See generally* 20 C.F.R. § 404.1527(c).

However, here, the ALJ appears to have based his decision to afford these opinions "little weight" without considering any of these enumerated factors. Instead, the ALJ bases his decision on his assertions that Jones received conservative treatment, that Jones' normal examinations belie Maduka's and Westerman's opinions of likely absenteeism, and upon the mere possibility that Maduka and Westerman have become so emotionally attached to Jones that they are unable to render dispassionate, professional opinions. R. 23. Nonetheless, the record does not support these conclusions, and thus the ALJ's determination lacks substantial evidence.

### 1. First reason: conservative treatment

First, as support for affording the opinions "little weight," the ALJ declares the treatment Jones received as "conservative." R. 23. However, the ALJ is unclear as to the meaning of the term conservative and the relevancy that conservative treatments have towards his decision to discredit Maduka's and Westerman's opinions. Accordingly, the mere declaration of Jones' treatment as conservative fails to "build an accurate and logical bridge from the evidence to his conclusion[]." *Clifford*, 227 F.3d at 872. This is because some medical conditions do not respond well to treatment, and in some cases more aggressive treatments are simply not available. Without any explanation, the reader is left to speculate. Further, the ALJ's inference that the degree of treatment must equate to the degree of severity of Jones' impairments, without any apparent medical basis, impermissibly amounts to the ALJ playing doctor. *See Rohan*, 98 F.3d at 970 (affirming that "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); *see also Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) (same).

### 2. Second reason: normal examinations and daily activities

Second, the ALJ claims that Maduka's and Westerman's treatment notes reveal normal examinations and document a host of daily activities, and thus their treatment notes are inconsistent with their opinions that Jones' would suffer three or more absences per month. However, this reason does not support the ALJ's conclusion.

With respect to the ALJ's reference to Jones' daily activities, the Seventh Circuit "[has] repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Indeed, "[a] claimant's ability to perform limited and sporadic tasks does not mean she is capable of full-time employment." *Goble v. Astrue*, 385 F. App'x 588, 592 (7th Cir. 2010) (internal citations omitted); *Reinaas*, 953 F.3d at 467 (reiterating that "there are critical differences between keeping up with activities of daily living and holding down a full-time job").

The analysis in *Roddy v. Astrue*, 705 F.3d at 639, is instructive here. In *Roddy*, where the ALJ based his decision denying benefits largely on the claimant's ability to care for herself and her pet and complete household chores, the court remanded because the claimant could only clean one room a day and limited herself to sandwiches as standing to cook caused too much pain. *Id.* Accordingly, the *Roddy* court ruled that the ALJ's reliance on spartan household tasks to support his denial overstated the residual functional capacity of the claimant. *Roddy*, 705 F.3d at 639.

Here, the ALJ cited the daily activities in which Jones has engaged: he attended graduations and a state fair, went to a "monster jam" truck rally, drove his fiancé daily to her several jobs, drove his kids, washed his clothes, shoveled snow, and ultimately drove his step-

daughter off to college at Alabama state university. R. 25. However, as Jones points out, these reasons fail to move the needle in showing that Jones was not severely impaired because there is no evidence describing the manner or extent in which Jones undertook these activities. For instance, the ALJ learns of Jones' drive to Alabama to drop-off his stepdaughter from a single-sentence note written by Westerman. R. 25. The remark does not appear connected to Westerman's analysis of Jones' impairments. R. 848. Importantly, the evidence does not provide any detail about the drive that eithers bolsters or contradicts Jones' claimed impairments. The remark does not explain whether Jones had to recline constantly, was in pain continuously, or had to stop and stretch frequently, or whether he experienced any severe headaches. *See Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (remanding claim because ALJ improperly concluded that claimant's ability to take two vacations undermined the severity of her condition without first determining whether any limitations constrained her vacations).

Further, the ALJ fails to cite to any medical evidence that would support his inference that Jones' impairments must necessarily preclude him from engaging in such daily activities. *See Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017) (remanding because in part the ALJ improperly concluded that claimant's daily activities discredited her claimed disability without any medical evidence in support of such an inference). Accordingly, Jones' daily activities, without additional evidence supporting the manner and extant in which he engaged in such activities, do not permit the ALJ to afford little weight to the opinions of Westerman and Maduka.

15

### 3. Third reason: compassionate bias

Third, the ALJ's supposition that Maduka's and Westerman's conclusions reflect their personal compassion for Jones rather than their professional assessment of Jones lacks any evidentiary support, and thus relies upon impermissible conjecture. "[A]n otherwise medically valid opinion will not be ignored merely because of speculation that the physician was sympathetic to the claimant." *Moss*, 555 F.3d at 560; *see Goyco v. Colvin*, No. 13 C 6328, 2014 WL 5152570, at *5 (N.D. Ill. Oct. 14, 2014) (affirming that "[a]n ALJ's mere conjecture of a sympathetic response is not an acceptable basis for ignoring" the opinions of the claimant's medical providers); *see Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir.2003) (same); *see Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995) (affirming that, absent "evidence of actual improprieties," the ALJ "may not assume that doctors routinely lie in order to help their patients").

Indeed, the ALJ concedes that his inference is a mere "possibility that always exists" and is "difficult to confirm." R. 23. While the ALJ asserts that the departure of their opinions from the evidence bolsters the likelihood of his suspicion, as noted above, the evidentiary record does not actually depart substantially from their opinions and, in fact, substantially supports them. Accordingly, this reason rests on pure, generalized speculation with the complete absence of any specific evidence tying this possibility to the opinions here.

## CONCLUSION

For all the foregoing reasons, the decision of the Commissioner is **REVERSED**, and this action is **REMANDED** pursuant to sentence four of section 205(g) of the Social Security

16

Act, 42 U.S.C. § 405(g), for proceedings consistent with this opinion. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 14th of July, 2020.

_____
STEPHEN C. DRIES
United States Magistrate Judge